## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **DARNELL J. PARKER** | ) | |
| **101 N Tryon Street, Suite 600** | ) | |
| **Charlotte, NC 28246** | ) | |
| | ) | |
| *Plaintiff,* | ) | **Case No. 22-2344** |
| | ) | |
| **v.** | ) | **Jury Trial Demand** |
| | ) | |
| **JANET L. YELLEN, SECRETARY,** | ) | |
| **UNITED STATES DEPARTMENT** | ) | |
| **OF THE TREASURY** | ) | |
| **1500 Pennsylvania Avenue, N.W.** | ) | |
| **Washington, D.C. 20220** | ) | |
| | ) | |
| *Defendant.* | ) | |

## COMPLAINT

Plaintiff Darnell J. Parker (hereinafter "Plaintiff Parker," "Mr. Parker," or "Plaintiff") by and through his attorneys, hereby files this Complaint against Janet L. Yellen, Secretary, United States Department of the Treasury (hereinafter "Defendant" or the "Agency"). Plaintiff seeks relief pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and seeks damages, including but not limited to declaratory, injunctive, and other equitable relief; compensatory damages; and litigation expenses and reasonable attorneys' fees based on Defendant's discriminatory, harassing, retaliatory, and otherwise unlawful actions against Plaintiff Parker.

1

## JURISDICTION AND VENUE

1.  This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e.

2.  Plaintiff has exhausted all administrative remedies prior to filing suit.

3.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that all or some events or omissions giving rise to Plaintiff's claims occurred in this judicial district, and Defendant may be found in this judicial district.

## PARTIES

4.  Plaintiff Darnell J. Parker is an African American male and a resident of the State of North Carolina. Plaintiff Parker is a former employee of the United States Department of the Tresaury.

5.  Defendant Janet L. Yellen is the Secretary and head of the United States Department of the Treasury. The Office of the Special Inspector General for the Troubled Asset Relief Program ("SIGTARP") is a large oversight office created within the United States Department of the Treasury for the purpose to monitor, audit, and investigate Troubled Asset Relief Program ("TARP") related activities. The United States Department of the Treasury is an agency within the United States federal government and an "employer" as defined by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (Title VII") under which Plaintiff brings his claims.

## FACTS

6.  Plaintiff Darnell J. Parker, a forty-nine (49) year old African American male, who worked for the Office of the Special Inspector General for the Troubled Asset Relief Program ("SIGTARP") within the United States Department of the Treasury as a Senior Investigative Research Specialist at the GS-14 level from 2003 to 2021. Mr. Parker previously had twenty years of experience in finance with an undergraduate degree in finance and a master's degree in information systems with five certifications and he performed at a GS-14 or CG-14 level for over fourteen years. Mr. Parker's immediate supervisor was Jeremy Ellis and his second level supervisor was Norman Embry, Assistant Deputy SIG for Investigations. Serving at the highest non-supervisory level Investigative Analyst within the Investigations Division, Mr. Parker's duties included but were not limited to independently coordinating, executing, and/or administering major, high-priority investigation cases which are central to office objectives; coordinating, executing, and discharging complex investigations, and most sensitive criminal and occasionally non-criminal investigations which came under the jurisdiction of the Special Inspector General for Troubled Asset Relief Program ("SIGTARP"); analyzing and evaluating complex data; conducting meetings, briefings and hearings; coordinating verification of data; preparing recommendations for the disposition of assignments; helping develop and implement significant new program strategies; analyzing key policy questions in the program area and contributing to significant agency decisions, policy recommendations and positions; representing the Agency authoritatively to key officials and organizations; preparing action

plans, schedules, and executing various investigations and ensures that plans were consistent with the Office goals and policies.

7. The Office of the Special Inspector General for the Troubled Asset Relief Program ("SIGTARP") is a large oversight office created within the United States Department of the Treasury for the purpose to monitor, audit, and investigate Troubled Asset Relief Program ("TARP") related activities.

8. Mr. Parker was recognized as a leader of analytical projects, Allowance for Loan and Lease Losses and Legal Lending Limit and was recognized as the expert for the Treasury Capital Purchase Program ("CPP") and Treasurer Making Home Affordable ("MHA") program.

9. Beginning in or around August 2017, and extending from September 12, 2017 through November 9, 2017, Mr. Parker was detailed to the Department of Justice "war room" in San Francisco, California, and was assigned work tasks by John W. Sellers. Mr. Sellers made comments to team lead Special Agent Tamara ("Tami") Weber and Special Agent Jim Thiede that Mr. Sellers "owned" Mr. Parker and labeled him as his administrative assistant. Mr. Sellers made oppressive comments about Mr. Parker, such as "I own Darnell" and "Darnell is my Administrative Assistant and works for me."

10. From August 2017 to November 2017, despite being an Investigative Research Specialist at the GS-14 level, Mr. Parker was assigned administrative duties by Mr. Sellers, which provided support to only Mr. Sellers, including assisting in daily trial preparation needs and general administrative support for Mr. Sellers only. Mr. Parker, for example, was not

assigned any financial analysis work, call report examination, cash flow analysis, loan reviews, or assisted in witness or subject interviews as a GS-14, and was restricted to only perform trial paralegal (GS-12) work in areas of lawsuits, trials, and courtroom activity to assist attorneys in prepare for jury and bench trials and exhibit binder preparation and organizing pretrial documents. Mr. Sellers manipulated Mr. Parker into performing Administrative Assistant duties despite Mr. Parker being a GS-14 Senior Investigative Research Specialist.

11. On or around October 10, 2017, extending through November 9, 2017, Mr. Sellers continued to use threats, insults, made derogatory comments, and verbal intimidated against Mr. Parker on a routine basis. In the Department of Justice "war room" in San Francisco, CA, for example, Mr. Sellers repeatedly referred to Mr. Parker as a "fuck up" and repeated these statements including "I know you're going to fuck it up!", and "Don't fuck it up!", and "I see you fucking it up!", and "You're a fuck up!" Mr. Sellers continuously made derogatory comments about Mr. Parker such as calling Mr. Parker a "fuck up" and saying he knew Mr. Parker would mess up a task.

12. Mr. Parker engaged in protected activity by alleging racial discrimination to his supervisor, Ms. Nenette Day, during the week of October 16, 2017. John W. Sellers had advanced knowledge of Mr. Parker's prior engagement in protected activity while he subjected Mr. Parker to a hostile work environment due to a verbal warning provided by Mr. Sellers' manager, Mr. Thomas Jankowski, on or around October 20, 2017. Mr. Jankowski's verbal

warning on or around October 20, 2017, included details regarding Mr. Parker's allegations of racial discrimination, making Mr. Sellers aware of Mr. Parker's EEO activity.

13. On or around October 18, 2017, Mr. Sellers inquired about a Department of Justice Employee named Maria Sunga and inappropriate comments about Ms. Sunga. Ms. Sunga worked as the Department of Justice Witness Coordinator on assignment. Mr. Sellers made misogynist comments about being intimate with Ms. Sunga, including an incident in which Ms. Sunga entered the Agency designated "war room" to provide Special Agent Jim Theide witness travel reimbursement forms, and as Ms. Sugna exited the room, Mr. Sellers made comments about Ms. Sunga such as "Who the fuck is that? I need to meet her!", and "I would love to jump on her!", and "I'm in love with her!" Mr. Sellers continued to rant, repeat these statements, and comment about Ms. Sunga for about twenty minutes. The comments were so offensive to Mrs. Weber, that Mrs. Webber put her headphones in to listen to music. Mr. Sellers also asked Mr. Thiede to introduce him to Ms. Sunga or give him a task so Mr. Sellers could go to the 10th floor and meet Ms. Sunga.

14. Mr. Parker also engaged in EEO activity, EEO case number SIGTAR-18-0290-F. On or around October 20, 2017, Nenette Day communicated the prior EEO activity, John Seller created a hostile work environment and racial discrimination activity, to Norman Embry and Thomas Jankowski.

15. On or around October 20, 2017, Mr. Sellers cancelled Mr. Parker's TDY to San Francisco, CA for trial assistance without proper notice (and without proper authority) via an email sent to Ms. Day and Mr. Jankowski and Mrs. Weber. On October 20, 2017, Mr. Parker

left San Francisco, CA (from his initial arrival on or around August 21, 2017) with travel plans to return to Washington, D.C., the following Monday. On Friday while on Mr. Parker's flight back to Washington, D.C., Mr. Sellers sent an email stating that Mr. Parker would not be needed and requested that Mr. Parker not return. Mr. Parker then contacted his supervisor, Ms. Day, to explain that he had left his luggage at a hotel and his clothes at a dry cleaner. After reviewing Mr. Parker's request with Mrs. Weber, Ms. Day determined that Mr. Parker was needed for the trial preparation and his travel plans remained unchanged. Mr. Parker was only authorized to travel with the approval of his immediate supervisor Ms. Day and not Mr. Sellers. Mr. Parker did not work weekends and was only available for forty hours a week, causing a risk of his reputation with colleagues that Mr. Parker was not a team player or hard worker. Mr. Parker was scheduled to work Monday through Friday with a capped limit of forty hours per week with no overtime, credit hours, or compensation item due to budget constraints. Mr. Sellers overstepped his position by overtaking Mrs. Weber to control and manipulate Mr. Parker's scheduling by canceling Mr. Parker's trip. Mr. Sellers also continued to manipulate Mr. Parker's schedule on a weekly basis, including providing Mr. Parker week-long assignments and canceling at the last minute and approving before Mr. Parker left. No reason was provided as to why Mr. Parker's schedule was changed.

16.    On or around October 23, 2017, in the Agency "war room" during internal preparation for a trial, Mr. Sellers stated to everyone in the war room, "I own Darnell", and repeatedly referred to Mr. Parker as his administrative assistant: "He is my Administrative Assistant and works for me" directly to several to Mr. Parker's Caucasian colleagues including

Tamera Weber, John Carrillo, Jim Thiede and Stephen Corrigan. Mr. Sellers made demeaning statements and innuendos common against Mr. Parker and continually made oppressive comments about Mr. Parker, such as "I own Darnell" and "Darnell is my Administrative Assistant and works for me."

17. On or around October 24, 2017, Mr. Sellers insulted Mr. Parker for coming in at Mr. Parker's standard agreed time with Mrs. Weber. Mr. Seller changed Mr. Parker's scheduling hours to begin at 8:00 a.m., due to trial preparation and without the permission of Mrs. Weber.

18. On or around October 26-28, 2017, Mr. Sellers brought a bottle of wine and plastic cups to the Department of Justice "war room" and consumed alcoholic beverages with armed federal agents on Agency property while in Mr. Parker's presence. Mr. Sellers' unauthorized possession and use of alcohol on federal property concerned Mr. Parker and Mr. Parker believed the drinking started around 4:50 p.m., and the wine bottle arrived in the war room around 5:30 p.m. Mrs. Weber, Mr. Theide, and John Carrillo joined Mr. Sellers in drinking and were armed while drinking.

19. On or around October 30, 2017, through November 9, 2017, Mr. Sellers made additional comments about surveilling Mr. Parker in the workplace. Mr. Sellers stated on several occasions, "I'm watching you! I know all your moves! I got something on you!" Mr. Sellers, being a former prosecutor and based on his conduct, made Mr. Parker feel uncomfortable.

20. On or about November 2, 2017, Mr. Sellers left the Department of Justice "war room" early afternoon around 2:30 p.m. and instructed Mr. Parker to lie about Mr. Sellers'

whereabouts. Mr. Sellers stated that he was going to meet a female friend at GIGI's Bed and Breakfast on 43rd Street. While Mr. Sellers was removing clothes from his full-size suitcase and packing items into an overnight Trader Joe's grocery bag, Mr. Sellers stated, "I probably won't come back, and Jim Thiede is informed and will cover if AUSA Adams Reeves asks about my whereabouts." Mr. Sellers made Mr. Parker uncomfortable requesting him to lie about his whereabouts.

21. On or around Tuesday, November 15, 2017, Mr. Parker met with Mr. Jankowski in his office to discuss Mr. Parker's prior EEO activity. Mr. Jankowski noted he and Mr. Embry received verbal communication of a hostile work environment and racial discrimination activity from Ms. Day about Ms. Sellers' behavior.

22. On or around December 19, 2017, Ms. Day communicated the prior EEO activity to Mr. Embry and Mr. Jankowski via formal complaint letter.

23. On or around July 2017, Mr. Jankowski became Mr. Sellers' immediate Supervisor. Mr. Jankowski responded to an affidavit on the prior EEO case SIGTAR 18- 0290-F.

24. On or around April 18, 2018, Mr. Embry represented SIGTARP management during mediation on the prior EEO case SIGTAR-18-0290-F.

25. On or around August 20, 2018, Susan Lynn became Mr. Parker's supervisor. Ms. Lynn was aware of Mr. Parker's previous EEO activity due to that Mr. Parker had to request reasonable amount of official time to complete EEO activity and obtain permission from Ms. Lynn in advance. Ms. Lynn downgraded Mr. Parker's performance from "Outstanding" to "Exceed Expectations". Mr. Embry was Ms. Lynn's rating official/supervisor and Mr. Parker's

second line supervisor and the second level performance level reviewer. Mr. Parker requested a second review from Mr. Embry, Human Resources, and Jeremy Ellis. Mr. Embry and Human Resources did not provide an opportunity to appeal the performance management rating downgrade from "Outstanding" to "Exceed Expectations".

26. Mr. Ellis tried to have a second review and Ms. Lynn accepted the appropriate rating of "Outstanding." Mr. Ellis communicated to Ms. Lynn did not monitor Mr. Parker's work performance, lack supervisory role approving time sheets, and workload in Case Management System ("CMS"), and failed to-conduct the final performance management interview. Ms. Day was the former supervisor and rating official 88% of Mr. Parker's 2018 performance rating. Ms. Day provided Mr. Parker's performance to Ms. Lynn as "Outstanding" in September 2018 and December 2018.

27. Mr. Parker did not review his annual appraisal because SIGTARP and Ms. Lynn failed to follow OPM Performance Management guidance and official training approved by the Agency. The Agency failed to communicate any change of the rating period.

28. Mr. Parker did not provide a self-assessment for his annual appraisal. SIGTARP policy do not a written self-assessment.

29. On or around April 12, 2019, Mr. Parker's previous rating official and supervisor, Ms. Day provided an "Outstanding" rating at the mid-year evaluation meeting. During this meeting, Mr. Parker provided his verbal self-assessment of "Outstanding"; in which the rating official and employee agreed.

30. On or around August 14, 2018, Mr. Parker's former supervisor and rating official, Ms. Day provided Mr. Parker with a verbal PMR rating of "Outstanding" during their one-on-one meeting. Based on that meeting, Mr. Parker's understanding was that his performance rating for the year would be based on the verbal rating of "Outstanding" conveyed to Mr. Parker by his rating official Ms. Day. During this meeting, Mr. Parker provided his verbal self-assessment of "Outstanding"; in which the rating official and employee agreed.

31. Ms. Lynn changed Mr. Parker's annual appraisal from "Outstanding" to "Exceed Expectations" due to his prior EEO activity, race, gender, and age. Ms. Lynn stated Mr. Parker's performance rating was "Exceed Expectations" due to Mr. Parker not uploading documents into CMS but that statement is inaccurate. During the 2018 performance period, Mr. Parker was not required and did not have permission to upload documents into CMS. It was the responsibility of the Special Agent to upload the documents to the CMS system after they were approved by Ms. Day. Mr. Parker believes that Ms. Lynn unfairly downgraded his performance rating because she did not have a full understanding of the scope of work related to Mr. Parker's position and the responsibilities in his role. Mr. Parker believes this is an indication Ms. Lynn did not fully understand the cases and never schedule a one-on-one meeting before the evaluation occurred so that she could make a fully informed decision and provide a proper rating.

32. Ms. Lynn and Mr. Parker participated in a conference call together to discuss the Exceed Expectation rating. Mr. Parker found her response that a rating of "Exceed Expectations" was considered a good performance rating to be insulting. In addition, Mr.

Parker was not consoled by Ms. Lynn's offer of an Award for time off instead of rating his performance as "Outstanding." Ms. Lynn stated she would consider a rating of "Outstanding" after he provided her with more documentation.

33. Ms. Lynn did acknowledge that she received Ms. Day's feedback regarding Mr. Parker's as a recommendation for a rating of "Outstanding" but stated she was reluctant to give anyone a rating of "Outstanding" Furthermore, Ms. Lynn and SIGTARP never communicated or established a different appraisal cycle for Mr. Parker, as required under 5 CFR 430.204, which resulted in Ms. Lynn failing to establish the minimum appraisal period for Mr. Parker and lacking the necessary information to properly establish a rating for Mr. Parker.

34. The lowering of Mr. Parker's rating from "Outstanding" to "Exceed Expectations" affected his employment with a lack of opportunity to apply for positions, promotions, and bonuses which have equated to a financial loss of $15,200 annually due to his job application not being referred to a selection official. Mr. Parker's performance rating has a bearing on job announcement vacancy questions and can determine whether a candidate is referred to the selecting official. Furthermore, Mr. Parker's performance rating has a bearing on determining his additional retention service credit in a possible reduction in force. Due to his downgrade in rating to "Exceed Expectations", Mr. Parker will be in a different category group and will lose one year of eligibility of employment. This placement in a different category equates to $152,252 in compensation, $11,388 in vacation time, and $7,592 in sick leave.

35. Mr. Parker disagrees with his rating of "Exceeds Expectations" as he received a rating of "Outstanding" from his previous rating official and supervisor, Ms. Day.  Mr. Parker also provided a verbal self-assessment of "Outstanding" during his mid-year evaluation in which Ms. Day, as the assigned rating official, agreed.  Furthermore, during the 2018 fiscal year, Mr. Parker spent 88.88% (322 days) of his time with the Ms. Day as compared to only 11.78% (43 days) with Ms. Lynn, the incoming supervisor.  Id.  based on the amount of time spent with Ms. Day compared to Ms. Lynn, Mr. Parker disagrees with Ms. Lynn's rating score.  The minimum appraisal period for employees is 90 calendar days, in accordance with the Special Inspector General for the Trouble Asset Relief Program ("SIGTARP"), Management Instruction, MI-OD-HR-2013-03, Monitoring Performance Minimum Period.  Ms. Lynn only monitored Mr. Parker's role as Senior Investigative Research Analyst for a period of 43 days, insufficient time to properly give Mr. Parker a performance rating.

36. Ms. Lynn was negligent in monitoring Mr. Parker's performance in that she failed to approve or review any of Mr. Parker's submitted work hour time keeping reports.Ms. Lynn did not schedule a time to discuss Mr. Parker's performance objectives and standards and never met with Mr. Parker to discuss such objectives.  Lastly, Ms. Lynn was negligent in monitoring Mr. Parker's performance due to her lack of understanding in regard to the Case Management System ("CMS") and the responsibility of the Special Agent to upload documents to the CMS system after they are approved.

37. On or around November 15, 2018, Mr. Parker communicated to his new supervisor, Mr. Ellis, that he disagreed with the downgrade on his performance rating, and he

communicated to Mr. Ellis that Ms. Lynn never once met with him one-on-one to discuss his objectives goals, or work product in order to provide an accurate assessment of his work.

38.  In late November 2018, Mr. Parker communicated to Human Resources that Ms. Lynn ever met with him one-on-one to discuss his objectives, goals, or work product.

39.  On or around December 2018, Mr. Embry came to Mr. Parker's desk to obtain his signature and Mr. Parker communicated to Mr. Embry that Ms. Lynn never met to discuss objectives, goals, or work product and Mr. Parker refuse to sign the PMR document and requested a second level review.  Mr. Ellis worked with the Agency's Human Resources department to resolve Mr. Parker's disagreement with Ms. Lynn and communicated to Mr. Parker that he agreed with him that Ms. Lynn did not meet the minimum 90 day monitoring threshold to properly provide a performance rating.

40.  On or around December 11, 2019, Mr. Ellis communicated that Mr. Parker's second line supervisor Norman Embry and head of Investigations Thomas Jankowski have to approve all PMR ratings before a supervisor provides the final rating.

41. On or around February 26, 2019, Mr. Parker sent an email to Ms. Lynn, Mr. Marquee Washington with Human Resources, and Mr. Ellis stating that in accordance with OPM Performance Management guidance he should have received an interview to discuss his 2018 Performance Rating.Due to not receiving the interview, Mr. Parker requested an End of Year Performance Rating Discussion in order to understand the downgrade he suffered from his mid-year evaluation of "Outstanding" to his 2018 performance rating of "Exceeded Expectations".

42. Mr. Parker believes sex, race, and age were factors in him receiving a lower performance rating on his 2018 annual appraisal because Ms. Amber Voigt, a white female coworker under the age of 40 who was similarly situated to Mr. Parker, received an "Outstanding" performance rating from Ms. Lynn that was unchanged from Ms. Day's mid-year evaluation. Ms. Voigt, a white female under the age of 40 did not suffer a lower performance rating from Ms. Lynn, despite the fact that both Mr. Parker and Ms. Voigt received the same "Outstanding" rating from Ms. Day's mid-year evaluation.

43. Mr. Parker also believes that his prior engagement in protected activity before the EEO was a factor in receiving a lower performance rating because, as Mr. Ellis communicated to Mr. Parker, his second line supervisor Mr. Embry and head of Investigations Mr. Jankowski have to approve all PMR ratings before a supervisor provides the final rating, and both Mr. Embry and Mr. Jankowski had knowledge of Mr. Parker's protected activity. Moreover, Ms. Lynn had prior knowledge of Mr. Parker's prior EEO activity when she became his supervisor and Mr. Parker requested a reasonable amount of time to complete his EEO activity and even obtained direct permission for Ms. Lynn in advance. For these reasons, Mr. Parker filed this claim before the U.S. Equal Employment Opportunity Commission alleging discrimination based on sex, race, and age and retaliation for his engagement in protected activity.

44. Mr. Parker filed an EEO complaint with the Agency and the Agency investigated his claims and issued a Report of Investigation. Mr. Parker requested a hearing before the United States Equal Employment Opportunity Commission ("EEOC") and his complaint was

assigned to an Administrative Judge who ruled in favor of the Agency on May 14, 2021. Mr.

Parker was issued a Final Agency Decision on June 20, 2021 and Mr. Parker appealed the

decision to the EEOC Office of Federal Operations ("OFO") on July 12, 2021. On May 9,

2022, the OFO issued an Order affirming the Agency's Final Order adopting the AJ's decision

and advising Plaintiff of his right to sue within 90 days of the Order's issuance. Accordingly,

Plaintiff has exhausted all administrative remedies and timely files his Complaint.

<u>**COUNT I**</u>
**Violation of Title VII of the Civil Rights Act of 1964, *as amended* ("Title VII")**
**42 U.S.C. § 2000e *et seq.***
**Race, Gender, and Age Discrimination**
**Hostile Work Environment**
**Disparate Treatment**

45. Plaintiff realleges and incorporates by reference the above paragraphs as if fully

stated herein.

46. At all pertinent times, Defendant was an employer subject to the provisions of

Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e *et seq.*

47. At all pertinent times, Plaintiff was an employee entitled to protection under Title VII

of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e *et seq.*

48. Title VII of the Civil Rights Act of 1964 states it is an unlawful employment practice

for an employer to fail or refuse to hire or to discharge any individual, or otherwise to

discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's race or color and prohibits an

employer from taking adverse action against an employee because of the employee's race.

49. In violation of Title VII of the Civil Rights Act of 1964, Defendant knowingly and intentionally subjected Plaintiff to unlawful discrimination based on his race, gender, age, a hostile work environment, and disparate treatment when: Mr. Sellers manipulated Plaintiff into performing Administrative Assistant duties despite Plaintiff being a GS-14 Senior Investigative Research Specialist; Mr. Sellers made oppressive comments about Plaintiff, such as "I own Darnell" and "Darnell is my Administrative Assistant and works for me"; Mr. Sellers arbitrarily changed Plaintiff's work schedule without proper notice; on October 18, 2017, Mr. Sellers made inappropriate comments about a female co- worker; on or about October 30, 2017, Mr. Sellers threatened Plaintiff, and on or about November 9, 2017, Mr. Sellers made additional threatening comments about surveilling Plaintiff in the workplace; from about October 10, 2017 through November 9, 2017, Mr. Sellers continuously made derogatory comments about Complainant, such as calling Plaintiff a "fuck up" and saying he know Plaintiff would mess up a task; on November 2, 2017, Mr. Sellers instructed Plaintiff to lie about his whereabouts when leaving the office that afternoon; on October 28, 2017, Mr. Sellers brought and consumed alcoholic beverages with armed federal agents on Agency property while in Plaintiff's presence; and on March 4, 2019, Plaintiff received a rating of "Exceeds Expectations" on his 2018 annual appraisal.

50. Defendant had no legitimate business reason for any such acts.

51. As a direct and proximate result of the Defendant's actions, Plaintiff has suffered emotional distress and pain and suffering.

52. Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendant may have engaged in other discriminatory practices that are not yet fully known.

## COUNT II
**Violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII")**
**42 U.S.C. § 2000e *et seq*.**
**Retaliation**

53. Plaintiff realleges and incorporates by reference the above paragraphs as if fully stated herein.

54. At all pertinent times, Defendant was an employer subject to the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

55. At all pertinent times, Plaintiff was an employee entitled to protection under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

56. Title VII of the Civil Rights Act of 1964 states it is an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because such individual filed a complaint of discrimination.

57. Plaintiff is a member of a protected class due to his race, African American. Mr. Parker engaged in protected activity by alleging racial discrimination to his supervisor, Ms. Nenette Day, during the week of October 16, 2017. Mr. Sellers had advanced knowledge of Mr. Parker's prior engagement in protected activity while he subjected Mr. Parker to a hostile work environment due to a verbal warning provided by Mr. Sellers' manager, Mr. Thomas

Jankowski, on or around October 20, 2017. Mr. Jankowski's verbal warning on or around October 20, 2017, included details regarding Mr. Parker's allegations of racial discrimination, making Mr. Sellers aware of Mr. Parker's EEO activity.

58. Mr. Parker also engaged in EEO activity, EEO case number SIGTAR-18-0290-F. On or around October 20, 2017, Nenette Day communicated the prior EEO activity, John Seller created a hostile work environment and racial discrimination activity, to Norman Embry and Thomas Jankowski. On or around Tuesday, November 15, 2017, Mr. Parker met with Mr. Jankowski in his office to discuss Mr. Parker's prior EEO activity. Mr. Jankowski noted he and Mr. Embry received verbal communication of a hostile work environment and racial discrimination activity from Ms. Day about Ms. Sellers' behavior. On or around December 19, 2017, Ms. Day communicated the prior EEO activity to Mr. Embry and Mr. Jankowski via formal complaint letter. On or around July 2017, Mr. Jankowski became Mr. Sellers' immediate Supervisor. Mr. Jankowski responded to an affidavit on the prior EEO case SIGTAR 18- 0290-F. On or around April 18, 2018, Mr. Embry represented SIGTARP management during mediation on the prior EEO case SIGTAR-18-0290-F. On or around August 20, 2018, Susan Lynn became Mr. Parker's supervisor. Ms. Lynn was aware of Mr. Parker's previous EEO activity due to that Mr. Parker had to request reasonable amount of official time to complete EEO activity and obtain permission from Ms. Lynn in advance. Ms. Lynn downgraded Mr. Parker's performance from "Outstanding" to "Exceed Expectations". Mr. Embry was Ms. Lynn's rating official/supervisor and Mr. Parker's second line supervisor and the second level performance level reviewer. Mr. Parker requested a second review from Mr.

19

Embry, Human Resources, and Jeremy Ellis. Mr. Embry and Human Resources did not provide an opportunity to appeal the performance management rating downgrade from "Outstanding" to "Exceed Expectations".

59. In violation of Title VII of the Civil Rights Act of 1964, Defendant knowingly and intentionally subjected Plaintiff to unlawful retaliation when: Mr. Sellers manipulated Plaintiff into performing Administrative Assistant duties despite Plaintiff being a GS-14 Senior Investigative Research Specialist; Mr. Sellers made oppressive comments about Plaintiff, such as "I own Darnell" and "Darnell is my Administrative Assistant and works for me"; Mr. Sellers arbitrarily changed Plaintiff's work schedule without proper notice; on October 18, 2017, Mr. Sellers made inappropriate comments about a female co- worker; on or about October 30, 2017, Mr. Sellers threatened Plaintiff, and on or about November 9, 2017, Mr. Sellers made additional threatening comments about surveilling Plaintiff in the workplace; from about October 10, 2017 through November 9, 2017, Mr. Sellers continuously made derogatory comments about Plaintiff, such as calling Plaintiff a "fuck up" and saying he know Plaintiff would mess up a task; on November 2, 2017, Mr. Sellers instructed Plaintiff to lie about his whereabouts when leaving the office that afternoon; on October 28, 2017, Mr. Sellers brought and consumed alcoholic beverages with armed federal agents on Agency property while in Plaintiff's  presence; and on March 4, 2019, Plaintiff received a rating of "Exceeds Expectations" on his 2018 annual appraisal.

60. Defendant had no legitimate business reason for any such acts.

61. As a direct and proximate result of the Defendant's actions, Plaintiff has suffered emotional distress and pain and suffering.

62. Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendant may have engaged in other retaliatory practices that are not yet fully known.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Parker prays as follows:

A.     That the Court issue an Order declaring Defendant violated Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e *et seq.*, and declaring Plaintiff eligible to receive equitable and other relief;

B.     Enter judgment against Defendant;

C.     Issue a permanent injunction prohibiting Defendant from engaging in any further acts of discrimination, harassment, and retaliation;

D.     Enter judgment in favor of Plaintiff against Defendant for all equitable monetary damages available under the law;

E.     Order Defendant to refrain from any action against Plaintiff, or any other person, for participating in or supporting this case in any manner;

F.     Order Defendant, individually and collectively, to pay compensatory damages in an amount no less than three hundred thousand dollars ($300,000.00);

G.     Order Defendant to pay Plaintiff's reasonable attorneys' fees, expert fees, and costs; and

H.     Order Defendant to pay pre-judgment and post-judgment interest as provided by law.

## **JURY TRIAL DEMAND**

Plaintiff demands a jury trial on all claims against Defendant.

Date: August 8, 2022                          Respectfully submitted,

                                        _____/s/ David A. Branch_____
                                        David A. Branch, Esq.
                                        D.C. Bar No. 438764
                                        The Law Office of David A. Branch &
                                        Associates, PLLC
                                        1828 L Street, N.W., Suite 820
                                        Washington, D.C. 20036
                                        Phone: (202) 785-2805
                                        Fax: (202) 785-0289
                                        Email: davidbranch@dbranchlaw.com