UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DARNELL J. PARKER<br><br>*Plaintiff*,<br><br>v.<br><br>SCOTT BESSENT, Secretary of the Treasury<br><br>*Defendant*.[1] | No. 22-cv-2344-MAU |

## MEMORANDUM OPINION

Plaintiff Darnell J. Parker ("Parker") brings claims of discrimination, hostile work environment, and retaliation against his former employer, Defendant Secretary of the Treasury ("Agency"), under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ECF No. 1. Before the Court is the Agency's Motion for Judgment on the Pleadings, or in the Alternative, Summary Judgment ("Motion"). ECF No. 37. Because Parker has failed to raise a triable issue on any of his claims, the Agency's Motion for Summary Judgment is **GRANTED**, and its Motion for Judgment on the Pleadings is **DENIED AS MOOT**.

## FACTUAL SUMMARY

The facts are largely undisputed. Parker served as a Senior Investigative Research Specialist at the General Schedule level 14 ("GS-14") in the Office of the Special Inspector General for the Troubled Asset Relief Program within the U.S. Department of the Treasury in Washington, D.C. ECF No. 39 at 7.[2] Parker agreed to a temporary assignment assisting the United

---

[1] Scott Bessent is substituted for his predecessor Janet Yellen. The caption is updated in court documents pursuant to Federal Rule of Civil Procedure 25(d).
[2] Citations are to page numbers in the ECF headers.

1

States Attorney's Office for the Northern District of California in preparing for trial in San Francisco. Def.'s Statement of Material Facts as to Which There is No Genuine Dispute, ECF No. 37-2 ¶¶ 1–5; Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts, ECF No. 39-1 ¶¶ 1–5. From August 22, 2017, to November 9, 2017, Parker worked in the "war room" for that trial. ECF Nos. 37-2 ¶ 6; 39-1 ¶ 6; 22 ¶ 9. There, Parker and his colleagues performed pre-trial work, including copying documents, assembling witness binders, and preparing exhibit binders. ECF Nos. 37-2 ¶ 9; 39-1 ¶ 9. Parker claims that one of his colleagues, Investigative Counsel John Sellers, "manipulated" him into performing mundane trial preparation work below Parker's GS-14 level. ECF Nos. 37-2 ¶ 7; 39-1 ¶ 7. Other colleagues likewise assigned Parker work and helped Sellers with work. ECF Nos. 37-2 ¶¶ 10–11; 39-1 ¶¶ 10–11.

Parker's Title VII claims center on Sellers's alleged inappropriate conduct in the war room. According to Parker, Sellers made multiple "oppressive" and "derogatory" comments and threatened, insulted, and verbally intimidated Parker. ECF Nos. 39 at 8–9; 37-2 ¶¶ 13–14; 39-2 ¶¶ 13–14. Specifically, on October 23, 2017, Sellers said, "I own Darnell," and "Darnell is my Administrative Assistant and works for me." ECF No. 39 at 11; *see* ECF Nos. 37-2 ¶ 13; 39-2 ¶ 13. The next day, Sellers "insulted" Parker for "coming in at his standard [] time." ECF No. 39 at 11. Although Parker describes Sellers as "routinely claim[ing] ownership of [Parker] in front of his colleagues," it is unclear whether or how often other incidents occurred. *Id.* at 20. From October 10 through November 9, Sellers "repeatedly referred to [Parker] as a 'fuck up'" and made "derogatory" comments about Parker. *Id.* at 9; *see also* ECF Nos. 37-2 ¶ 14; 39-1 ¶ 14. Additionally, from October 30 through November 9, Sellers made "comments about surveilling [Parker] in the workplace" by stating "on several occasions," "I'm watching you! I know all your moves! I got something on you!" ECF No. 39 at 12.

To support his Title VII claims, Parker has also described other incidents from his time in the war room, although it is unclear how these incidents relate to Parker's claims that Sellers discriminated against Parker based on his protected status:

- On October 18, Sellers made sexually inappropriate comments about a female Department of Justice employee. *Id.* at 10.

- On October 20, when Parker was in Washington, D.C., with plans to return to San Francisco, Sellers emailed Parker's supervisors stating Parker would not be needed and requesting that Parker not return. *Id.*; ECF Nos. 37-2 ¶ 15; 39-1 ¶ 15. Parker characterizes this incident as Sellers attempting to "manipulate" his schedule. ECF No. 39 at 11.

- Around October 26–28, Sellers and other war room colleagues, who Parker describes as "armed agents," drank alcohol on the premises. *Id.*

- On November 2, Sellers left the war room early to meet a female friend at a bed and breakfast and stated he would not come back but another agent would cover for him. *Id.* at 12. Sellers "made [Parker] uncomfortable by requesting [Parker] to [sic] lie about his whereabouts." *Id.*

During the week of October 16, 2017, Parker alleged racial discrimination to his supervisor, Nenette Day. *Id.* at 9. On October 20, Thomas Jankowski, Sellers's manager, gave Sellers a "verbal warning" which included "details regarding the allegations of racial discrimination and harassment." *Id.* Less than three weeks later, on November 9, Parker's service in the war room concluded. *Id.* at 8. On November 15, presumably after Parker returned to D.C., Jankowski met with Parker to inform him that he and another supervisor were aware of Parker's complaints about Sellers's behavior. *Id.* at 12.

Parker worked in the war room with Sellers for just under three months and returned to Washington, D.C., thereafter. *Id.* at 8. On August 14, 2018, at Parker's midyear review, Day verbally told Parker he was performing at an "Outstanding" level. ECF Nos. 37-2 ¶ 18; 39-1 ¶ 18; 39 at 13–14. On August 20, Susan Lynn then replaced Day as Parker's supervisor. ECF No. 39 at 13. On November 21, 2018, Lynn formally rated Parker with "Exceeds Expectations" on his

annual review, which is lower than the "Outstanding" rating Day had verbally given him.  ECF Nos. 37-2 ¶ 23; 39 at 13.  Parker claims that Lynn gave his white female coworker, Amber Voigt, a higher "Outstanding" rating.  ECF Nos. 37-2 ¶ 27; 39-1 ¶ 27.

## PROCEDURAL HISTORY

Parker made initial contact with an Equal Employment Opportunity Commission ("EEOC") counselor on December 19, 2017 and filed a formal complaint with the EEOC on April 18, 2018.  ECF Nos. 37-10 at 1, 9; 37-23 at 1.  Parker's allegations regarding Sellers's conduct in his EEOC letter largely track his Complaint in this Court.  *See generally* ECF No. 37-10 at 14–15.  On May 14, 2021, an administrative law judge ruled in favor of the Agency.  ECF No. 1 ¶ 44.  On June 20, 2021, the EEOC issued its Final Agency Decision.  *Id.*  On May 9, 2022, the EEOC Office of Federal Operations affirmed the Final Agency Decision.  *Id.*  Parker filed this Complaint on August 8, 2022.  ECF No. 1.  The Parties completed discovery on February 5, 2024.  Minute Order (Dec. 4, 2023).

## ANALYSIS

The Agency seeks summary judgment on both counts of Parker's Complaint.  ECF No. 37-1 at 9.  As discussed below, the Agency is entitled to summary judgment because Parker has failed to show that he is entitled to trial on either count of his Complaint.  The Agency also moves for judgment on the pleadings under Rule 12(c).  *Id.*; *see* Fed. R. Civ. P. 12(c), (h)(2)(B).  Because the Agency is entitled to summary judgment, the Court need not resolve the Rule 12(c) Motion.

### I. Standard of Review

The Court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit" under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is

"genuine" if there is enough evidence that a "reasonable jury could return a verdict for the nonmoving party." *Id.* The Court's inquiry is essentially "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The Court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 378 (2007).

The movant bears the initial burden to identify portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see* Fed. R. Civ. P. 56(c)(1). The nonmovant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See* Fed. R. Civ. P. 56(c)(1). It must show there is "sufficient evidence," which is evidence that is "significantly probative" and does not merely show "some metaphysical doubt as to the material facts" such that a jury could return a verdict in its favor. *Liberty Lobby*, 477 U.S. at 249; *Scott*, 550 U.S. at 380 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

II.     **Count I: Discrimination and Hostile Work Environment**

In Count I, Parker alleges race discrimination due to disparate treatment and a hostile work environment. ECF No. 1 ¶ 49.[3] Parker asserts that his discrimination claims arise from two allegedly adverse employment actions: (1) "his unsafe work environment"; and (2) "a diminished performance evaluation." ECF No. 39 at 26. For the reasons set forth below, Parker actually

---

[3] There is no dispute that Parker is a member of a protected class, as he is African American. Parker also alleges discrimination on the basis of gender and age. ECF No. 1 ¶ 49. Because he has failed to articulate any argument related to gender-based and age-based discrimination, however, he has waived those arguments. In any event, there are no facts alleged in the Complaint or in the record to raise a genuine issue of material fact as to gender-based and age-based discrimination.

asserts two separate theories under Title VII. The Court construes Count I as two claims, one for disparate treatment and one for hostile work environment.

### A. Disparate Treatment

The Agency argues that it is entitled to summary judgment on Parker's disparate treatment claims because, in part, there is no genuine issue as to whether the Agency discriminated against Parker through Sellers's war room conduct or the performance evaluation. ECF Nos. 37-1 at 36–37; 40 at 10–13. The Agency is correct.

Under Title VII, the federal government is prohibited from "discriminating against employees on the basis of race." *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015); *see* 42 U.S.C. § 2000e-16(a). When there is only circumstantial evidence of discrimination, the *McDonnell Douglas* burden-shifting framework governs the analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973); *see also Walker*, 798 F.3d at 1091. First, a plaintiff must establish a prima facie case: he is a member of a protected class; he suffered a cognizable adverse employment action; and that action gives rise to an inference of discrimination. *See Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113–14 (D.C. Cir. 2016) (citing *Walker*, 798 F.3d at 1091). The burden then shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for its action." *Id.* at 1114. At that point, the burden shifts back to the plaintiff "to show that the employer's stated reason for its actions was in fact pretext for unlawful discrimination." *Id.*; *see Walker*, 798 F.3d at 1092.

At summary judgment, because "the employer ordinarily will have asserted a legitimate, non-discriminatory reason for the challenged decision," courts often apply the so-called "*Brady* shortcut." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008); *see Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019) (describing the "*Brady* shortcut" as a "suggested preference for merits resolution," which the court should follow "only when feasible"). When

6

applying *Brady*, the court should resolve one "central question": whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee." *Brady*, 520 F.3d at 494.

As an initial matter, Parker's disparate treatment claim is based in part on an "unsafe work environment" due to Sellers's comments and insults and one incident when Sellers was drinking with armed agents. ECF No. 39 at 27–28. Parker has failed, however, to support his theory that an "unsafe work environment" may serve as a cognizable adverse employment action separate from a hostile work environment claim. Nor could he. *Cf. Brooks v. Grundmann*, 748 F.3d 1273, 1278 (D.C. Cir. 2014) ("Unlike a hostile work environment claim, which involves repeated conduct . . . [that] occurs over a series of days or perhaps years and . . . [where] a single act of harassment may not be actionable on its own, a discrete-acts claim involves a single act of discrimination such as termination, failure to promote, denial of transfer, or refusal to hire." (alterations in original) (internal quotation marks and citation omitted)); *Panarello v. Zinke*, 254 F. Supp. 3d 85, 103 (D.D.C. 2017), *aff'd sub nom. Panarello v. Bernhardt*, 788 F. App'x 18 (D.C. Cir. 2019) (unpublished) (explaining "[d]iscrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim, which must be based on severe and pervasive discriminatory intimidation or insult" (internal quotation marks and citation omitted)). Accordingly, the Court will construe Parker's allegations regarding an "unsafe work environment" under Count I as a separate "hostile work environment" claim.

This leaves Parker's 2018 performance review. ECF No. 39 at 26–27. In his Opposition, Parker does not clearly articulate his theory of discrimination and instead states in a conclusory manner that he is a "member of a protected class" and "suffered [an] adverse employment action

7

in the form of . . . a diminished performance evaluation that affected his salary, job offer, and promotion status." *Id.* at 26. It appears that Parker's contention is that Lynn "downgraded" his performance review to "Exceeds Expectations" for some discriminatory reason. *See id.* at 15; ECF No. 1 ¶ 49 (alleging "unlawful discrimination based on his race, gender, age" including when "[Parker] received a rating of 'Exceeds Expectations' on his 2018 annual appraisal"). The "downgrade" to which Parker ostensibly refers is the change from Day's August 14, 2018 verbal midyear rating of "Outstanding." ECF No. 39 at 13.

The Agency argues that the rating was based on a nondiscriminatory reason: Lynn did not rate Parker appropriately because she misunderstood his job responsibilities. ECF No. 37-1 at 37. Although he does not fully explain his argument, Parker maintains that his rating was discriminatory based on: (1) an alleged comparator; and (2) "irregularities" in the evaluation process. ECF No. 39 at 27. Neither of Parker's explanations is availing. Even assuming the performance review constituted an "adverse employment action," Parker has failed to meet his burden to raise a genuine issue of material fact warranting a trial for disparate treatment discrimination.

> 1. **The Agency's Legitimate, Nondiscriminatory Reason for Parker's Review.**

Assuming for the sake of argument that Parker made out a prima facie case, the Agency must provide a legitimate, nondiscriminatory reason for its action at the second step of the *McDonnell Douglas* framework.[4] *Wheeler*, 812 F.3d at 1114. The Agency argues that Lynn gave

---

[4] An employer satisfies its burden of providing a legitimate, nondiscriminatory reason for its actions when: (1) it "produce[s] evidence that a factfinder may consider at trial (or a summary judgment proceeding)"; (2) the factfinder is "reasonably . . . able to find that the employer's action was motivated by a nondiscriminatory reason"; (3) the "nondiscriminatory explanation [is] . . . facially credible in light of the proffered evidence"; and (4) the evidence presents a "clear and reasonably specific explanation." *Figueroa*, 923 F.3d at 1087–88 (internal quotation marks and citations omitted).

Parker an "Exceeds Expectations" performance review not because she was motivated by racial animus, but because she had an inaccurate assessment of Parker's job responsibilities. ECF Nos. 37-1 at 37; 37-2 ¶ 23 (citing ECF Nos. 37-12, 37-15 & 37-16). In Parker's EEO complaint and investigative affidavits, Parker explained that he "believe[d] that Ms. Lynn unfairly downgraded [his] performance rating because she did not have fill [sic] understanding of the scope of work related to [his] position and [his] responsibilities in [his] role." ECF No. 37-15 at 2; *see also* ECF No. 37-16 at 4. Specifically, Lynn's primary rationale for his "diminished" review was that Parker did not upload documents into the Central Management System. ECF No. 37-16 at 6. In his role, however, Parker was "not required and did not have permission to upload documents" into that system, and, thus, Lynn's rating was mistaken. ECF No. 37-15 at 2. Further, Parker had multiple grievances against Lynn: she was negligent in monitoring his performance and in completing his formal review, and she did not "fully review, evaluate, or provide an accurate assessment of [his] work." ECF No. 37-16 at 7. None of these facts are disputed, and in fact Parker generally repeats them in his Opposition. ECF No. 39 at 14–15. Thus, there is no genuine dispute that the Agency has offered a legitimate, nondiscriminatory reason for Parker's performance review.

> **2.   Parker has Failed to Offer Sufficient Evidence for a Reasonable Jury to Conclude that the Proffered Reason for His Review was Pretext for Unlawful Discrimination.**

The only question left for the Court is whether Parker has met his burden to identify a genuine dispute of material fact that the Agency's stated reason for Lynn's review was pretext *and* that the actual reason for the rating was discrimination based on Parker's race. *See Wheeler*, 812 F.3d at 1114. Here, Parker has failed to point to any facts, let alone those sufficient to raise a genuine dispute, to show that Lynn's performance review resulted from racial animus. Parker's only support is an unsubstantiated, conclusory statement that he "adequately identified a tangible harm, a comparator who was treated better, and irregularities in the performance evaluation

process." ECF No. 39 at 27. Parker's failure in his Opposition and Local Rule 7(h) statement to point to record evidence to support this statement is plainly insufficient to meet his burden to overcome summary judgment. Nor is the Court required to search for the evidence to support Parker's Opposition. *See Jeffries v. Barr*, 965 F.3d 843, 861 (D.C. Cir. 2020) ("[J]udges are not like pigs, hunting for truffles buried in briefs or in the record[.]" (alterations in original) (quoting *Jones v. Kirchner*, 835 F.3d 74, 83 (D.C. Cir. 2016))).[5] Even going beyond the allegations to which Parker cites and looking at the record as a whole, there still does not appear to be any genuine issue of material fact for trial. The only irregularity in his performance review is the fact that Lynn extended the end date of his review period by seventeen days, but Lynn plainly explained to Parker that the "date was pushed out to include 60 days under my supervision." ECF No. 37-14 at 1. Parker fails to articulate how this extension gives rise to an inference of discrimination.

Parker's cursory reference to an unnamed "comparator" fares no better. *See* ECF No. 39 at 27. Assuming Parker means his white female co-worker Amber Voigt, Parker's lack of evidence or explanation as to how he and Voigt are similarly situated is fatal. *Id.* at 16–17; *see Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999) (requiring a plaintiff with comparator evidence to prove that "all of the relevant aspects of her employment situation were nearly identical" to those of the other employee (internal quotation marks and citation omitted)). In fact, the evidence shows the opposite. *See* ECF Nos. 37-3 at 33 (Parker's discovery response admitting that Voigt was a GS-13 while Parker was a GS-14); 37-20 at 10:2–5 (Parker's deposition testimony answering "yes" to whether his "job responsibilities as a GS-14 are going to be at a higher level than a GS-13"); 37-17 at 9 (Lynn's affidavit stating that "[a]ny attempt to compare Ms. Voigt's rating with that of Mr.

---

[5] In his Local Rule 7(h) statement, Parker contends the reason for the supposed downgrade in his performance rating was "retaliatory animus," not discrimination. ECF No. 39-1 ¶ 23. This argument is discussed in connection with his retaliation claim.

Parker could be misleading and confusing since they are on different GS levels"). Parker has failed to establish a genuine dispute giving rise to a reasonable inference that the Agency's reason justifying his lowered performance rating was pretext for unlawful discrimination.

### B. Hostile Work Environment

The Agency argues that Parker cannot show any relationship between Sellers's alleged misconduct and Parker's membership in a protected class, nor any severe or pervasive harassment from Parker's three months in the war room. ECF No. 37-1 at 38–42. In response, Parker argues that he endured a hostile work environment based on Sellers's comments that he "own[ed]" Parker as well as Sellers's "host of supplemental abusive conduct." ECF No. 39 at 20–23. The Agency is correct.

To prevail on a hostile work environment claim, a plaintiff must establish that "his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The bar for conduct to rise to a hostile work environment is high. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment . . . ."); *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (noting Title VII is not a "general civility code for the American workplace"). Further, the victim must show that the "harassment complained of was based upon" the victim's protected status. *Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1122–23 (D.C. Cir. 2002). The Court should look to the totality of the circumstances, including "the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch*, 550 F.3d at 1201 (citing *Faragher*, 524 U.S. at 787–88).

11

When a plaintiff alleges harassment by a coworker, rather than a supervisor, the plaintiff must also prove "that the employer was at least negligent in not preventing or correcting the harassment." *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (per curiam) (citing *Faragher*, 524 U.S. at 789). A "supervisor" is an employee empowered "to take tangible employment actions against the victim, *i.e.*, to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance v. Ball State Univ.*, 570 U.S. 421, 433 (2013) (internal quotation marks and citation omitted).

### 1. Sellers's Comments of "Ownership" Did Not Rise to the Requisite Level of Severe or Pervasive Harassment.

Parker's principal argument is that Sellers's remarks that he "owned" Parker were "severely or pervasively racially hostile or abusive" to a sufficient degree to establish a cognizable hostile work environment claim. ECF No. 39 at 20–21. Parker's argument is unavailing. Although Parker claims that Sellers "*effectively* called [Parker] the N-word," he admits he "has *not* accused Mr. Seller's [sic] of uttering the N-word." *Id.* (emphases added). Even when viewing the facts in the light most favorable to Parker, Sellers's statements that he "owned" Parker do not rise to the level of pervasiveness or severity required to establish a hostile work environment.

Throughout his Opposition, pleadings, and discovery responses, Parker has identified only *one* specific incident, on October 23, 2017, when this occurred. *See* ECF Nos. 1 ¶ 16; 39 at 11; 37-3 at 15. Even viewing this identified incident in the light most favorable to Parker, this does not rise to the level of "severity" to establish a hostile work environment. It is "rare" when "a single incident can create a hostile work environment." *Ayissi-Etoh*, 712 F.3d at 579 (Kavanaugh, J. concurring); *see also Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002) ("Except in extreme circumstances, courts have refused to hold that one incident is so severe to constitute a

hostile work environment."). Based on the record, this is not one of those rare incidents.

Although Parker also generally claims that, from August through November 2017, Sellers made "repeated" comments that he "owned" Parker, Parker provides no detail or other record support for those assertions beyond his own interrogatory responses. ECF No. 39 at 22. Parker's contentions that Sellers's statements of "ownership" were "routine[]," "repeated," and on "multiple occasions" are conclusory at best. *Id.* at 20–22.

Even taking all the alleged statements together, Parker has failed to raise a genuine issue of material fact of a hostile work environment based on Parker's race. Contrary to Parker's contentions, Sellers stating he "owned" Parker because "[h]e is my Administrative Assistant and works for me" is not the same as "the use of an *unambiguously* racial epithet." ECF No. 39 at 11; *Ayissi-Etoh*, 712 F.3d at 577 (emphasis added). By Parker's own admissions, Sellers wanted Parker to work exclusively for him, and not for others, because Sellers was behind on his work. *See, e.g.*, ECF Nos. 37-6 at 19:2–12 (explaining how Sellers was "breaking up the relationship" Parker had with other agents because he "came in and put his foot down and tried to take control over me and have me work for him, since he was behind on a lot of his projects"); 37-3 at 15 ("Mr. Sellers stated to everyone in the war room, 'I own Darnell,' and repeatedly referred to me as his administrative assistant."). There is no question that, in the professional setting, Sellers's statements were likely brusque and offensive. *Cf. Toomer v. Esper*, 464 F. Supp. 3d 157, 168 (D.D.C. 2020), *aff'd sub nom. Toomer v. Austin*, No. 20-5184, 2022 WL 301561 (D.C. Cir. Jan. 21, 2022). Offensiveness alone, however, does not constitute *actionable* harassment based on a plaintiff's membership in a protected class. *See Harris*, 510 U.S. at 21 ("[M]ere utterance of an . . . epithet which engenders offensive feelings in an employee . . . does not sufficiently affect the conditions of employment to implicate Title VII." (internal quotation marks and citation omitted)).

13

Moreover, courts have found even more egregious statements insufficiently "severe" to establish a hostile work environment. *See, e.g.*, *Toomer*, 464 F. Supp. 3d at 168–70 (holding plaintiff failed to show a racially hostile work environment when supervisor asked plaintiff, who was Black, "Do you think of yourself as a monkey?"); *Harris v. Wackenhut Servs., Inc.*, 590 F. Supp. 2d 54, 61–62, 75–76 (D.D.C. 2008), *amended on other grounds*, 648 F. Supp. 2d 53 (D.D.C. 2009), *aff'd* 419 F. App'x 1 (D.C. Cir. 2011) (unpublished) (finding three incidents—where coworkers said to Black employee, "What do you call a black electrician in West Palm Beach, Florida? An Ohm Boy"; called employee a "black b[i]tch"; and stated another Black colleague "lives in the ghetto"—insufficiently "severe or pervasive to alter conditions of the [sic] his employment and create an abusive working environment" (alteration in original)); *Frett v. Howard Univ.*, No. 13-cv-551, 2016 WL 509282, at *5 (D.D.C. Feb. 8, 2016) (finding singular use of "HNIC"—an abbreviation for "head [n-word] in charge"—insufficiently severe to establish hostile work environment); *cf. Freedman v. MCI Telecomm. Corp.*, 255 F.3d 840, 848 (D.C. Cir. 2001) (holding incident when supervisor told Orthodox Jewish employee, "Soon I'm going to be the only one at this terminal wearing a Yarmulka," which employee took as "religious slander" "insufficient to establish an atmosphere of hostility"). Accordingly, even when viewing all the facts in the light most favorable to Parker, Sellers's "ownership" comments are not "sufficiently severe or pervasive to alter the conditions of [Parker]'s employment and create an abusive working environment" on the basis of Parker's membership in a protected class. *Harris*, 510 U.S. at 21 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

    **2.    Evidence of Sellers's "Supplemental Abusive Conduct" Does Not Create a Genuine Issue of Material Fact that Sellers's Conduct was Discriminatory.**

In addition to Sellers's "ownership" comments, Parker argues that Sellers engaged in "a host of supplemental abusive conduct" that supports his hostile work environment claim. ECF

14

No. 39 at 22. Parker's vague, unexplained reference to "supplemental abusive conduct," however, leaves the Court guessing and is, thus, insufficient to raise a triable issue. *See, e.g.*, *Arnoldi v. Bd. of Trs., Nat'l Gallery of Art*, 557 F. Supp. 3d 105, 120–21 (D.D.C. 2021) (finding where plaintiff broadly argued she provided a "long list of incidents" demonstrating harassment but provided almost no record evidence, plaintiff failed to meet the hostile work environment standard at summary judgment).

It is possible that Parker is referring to his allegations that Sellers called him a "fuck up," "insulted" Parker for coming in at his standard arrival time, "manipulated" Parker into performing "administrative" tasks, told Parker he was "watching" him, and attempted to "manipulate" Parker's schedule. ECF Nos. 39 at 9–12; 37-3 at 12–15. Even if these incidents are the "supplemental abusive conduct" to which Parker refers, Parker has failed to offer any evidence to raise a triable issue that Sellers's behavior was based on or motivated by Parker's race. *See Davis*, 275 F.3d at 1122–23; *see, e.g.*, *Gray v. Foxx*, 637 F. App'x 603, 608 (D.C. Cir. 2015) (per curiam) (unpublished) (holding hostile work environment claim failed when the "only evidence . . . is that [supervisor] yelled and belittled her" and plaintiff did "not connect [supervisor's] remarks to any protected status"); *Harris*, 590 F. Supp. 2d at 63–64, 76 (finding conduct including where coworkers mocked plaintiff's stutter with Porky Pig imitations, laughed at plaintiff during conference calls, and made wagers that plaintiff "isn't going anywhere" because the "money is too good" insufficient to support a hostile work environment claim because plaintiff "cannot cite to any facts or provide evidence that the comments . . . were based on his protected status").

It is also possible that the "supplemental abusive conduct" includes alleged incidents during which Parker claims Sellers made sexually inappropriate comments about a female colleague, consumed alcohol with other colleagues in the war room, and left work early and

15

instructed Parker to lie about Sellers's whereabouts. ECF No. 39 at 10–12. None of this conduct, however, was directed at Parker, let alone racially motivated. *See, e.g.*, *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 108 (D.D.C. 2005), *aff'd sub nom. Nurriddin v. Griffin*, 222 F. App'x 5 (D.C. Cir. 2007) (per curiam) (unpublished) ("When racial statements are not made directly to a plaintiff, generally a hostile environment cannot be established."). In short, Parker has failed to explain his argument about Sellers's "supplemental abusive conduct." But even when looking beyond Parker's briefing, considering the totality of the evidence, and drawing all reasonable inferences in favor of Parker, none of Sellers's actions amount to a hostile work environment for Parker as a matter of law.

### 3. Parker has Failed to Offer Sufficient Evidence that the Agency Should Be Vicariously Liable for Sellers's Actions.

Finally, even if the totality of Sellers's conduct did amount to actionable harassment, Parker's unsupported argument that the Agency should be vicariously liable because Sellers was his "effective" supervisor is unavailing. ECF Nos. 39 at 25–26; 39-1 ¶ 8 ("While it is true that Mr. Sellers was not [Parker's] formal supervisor on paper, he was his effective supervisor in San Francisco. . . ."). Parker has already stated that Sellers was *not* his supervisor. *See, e.g.*, ECF No. 37-3 at 32 ("I admit John Sellers was not my supervisor . . . ."). Moreover, Parker has not introduced any evidence that the Agency empowered Sellers to take any "tangible employment actions" against him. *Vance*, 570 U.S. at 431. Sellers's alleged ability to assign Parker work does not make him a "supervisor." ECF No. 39 at 26; *Vance*, 570 U.S. at 432 (rejecting definition of supervisor as "those who, although lacking this power, nevertheless have the ability to direct a co-worker's labor to some ill-defined degree"); *id.* at 439 ("The ability to direct another employee's tasks is simply not sufficient."). Parker has no record support for his vague, conclusory claim that Sellers could discipline him and, in any event, does not establish that Sellers could affect a

"*significant* change in employment status" such as "firing" or "a decision causing a significant change in benefits." *Id.* at 431 (emphasis added) (citation omitted); ECF No. 39 at 26; *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998) ("A tangible employment action in most cases inflicts direct economic harm.").

Parker's contention that Sellers could control his schedule is contradicted by his own interrogatory response. *See, e.g.*, ECF No. 37-3 at 14 (stating that, after Sellers informed Parker he would not be needed one week, "I then contacted my supervisor, Ms. Day," who "determined that I was needed for the trial preparation and my travel plans remained unchanged"); *id.* (stating "I was only authorized to travel with the approval of my immediate supervisor Ms. Day and not Mr. Sellers"). Accordingly, Parker has failed to raise a triable issue that Sellers was his supervisor. Parker otherwise does not argue that the Agency was negligent in not preventing Sellers's behavior, and, thus, his hostile work environment claim fails as a matter of law on this basis as well. *See Ayissi-Etoh*, 712 F.3d at 577.

### III. Count II: Retaliation

In Count II, Parker asserts a retaliation claim, which, although not clearly articulated, the Court construes to be largely based on two theories. ECF No. 1 ¶¶ 57–59. First, Parker argues that he engaged in protected activity when, on December 19, 2017, he initiated EEOC contact regarding Sellers's war room conduct. *Id.* ¶ 58 (stating he "engaged in EEO activity" and citing EEO case number); ECF No. 39-1 ¶ 23 (stating he "initiated formal EEO activity on December 19, 2017"). Parker claims the Agency retaliated against him when Lynn gave him an "Exceeds Expectations" performance review that was finalized on November 21, 2018. ECF No. 39-1 ¶ 23 (citing ECF No. 37-14 at 1–2). Second, Parker claims that he engaged in protected activity by reporting Sellers's conduct to Day on the week of October 16, 2017. ECF No. 1 ¶¶ 12, 58; *see also* ECF No. 39 at 24. Parker argues that Sellers, who became aware of Parker's complaint on

17

October 20, retaliated against him "in the form of . . . pervasive and severe adverse treatment." ECF No. 39 at 24. The Agency argues that neither basis constitutes an actionable harm, and Parker has failed to establish causation. ECF Nos. 37-1 at 45–48; 40 at 20–24. In response, Parker maintains these are actionable offenses and relies on a temporal nexus to establish causation for both. ECF No. 39 at 24–25. Parker's arguments are unavailing.

To prevail on a retaliation claim, a plaintiff must establish that his employer retaliated against him "because [he] opposed an unlawful employment practice or made a charge under the statute." *Walker*, 798 F.3d at 1091; *see* 42 U.S.C. § 2000e-3(a). Just as with discrimination claims, when plaintiffs cite circumstantial evidence, the *McDonnell Douglas* framework applies. To establish a prima facie case of retaliation, the plaintiff must show "[]he engaged in activity protected by Title VII, the employer took adverse action against [him], and the employer took that action because of the employee's protected conduct." *Walker*, 798 F.3d at 1091–92; *see also Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013). The burden next shifts to the employer to show a legitimate, nonretaliatory reason for its action, and then back to the plaintiff to show that reason was pretextual. *See Walker*, 798 F.3d at 1092. Again, courts may apply the "*Brady* shortcut" and skip the question of a prima facie case. *Id.*

Parker's first theory of retaliation is that, as alleged in his Complaint, he received a lower performance review based on the fact that he engaged in protected activity. ECF No. 1 ¶¶ 58–59. That said, Parker has failed to articulate any argument to that effect in his Opposition. Although he does purport to raise a dispute on this issue in his Local Rule 7(h) statement, this is not the proper vehicle for raising an argument. *See* LCvR 7(b), (h); ECF No. 39-1 ¶ 23 (arguing the "close proximity between [his] EEO activity and his performance rating downgrade creates a dispute in material fact over whether his downgrade was a result of retaliatory animus"). Even if it were, as

18

with his disparate treatment claim, Parker merely relies on temporal proximity and "irregularities" in the performance evaluation as evidence of retaliation.  *See supra* § II.A.2; ECF No. 39-1 ¶ 23.  Here, Parker claims his EEO activity "continued past September 19, 2018 when [the Office of Federal Operations] remanded his complaint for further proceedings," and thus a "mere two months" elapsed between his EEO activity and the performance review.  ECF No. 39-1 ¶ 23.  Without more, even construing the facts in the light most favorable to Parker, and for the same reason that this argument fails to support his disparate treatment claim, no reasonable jury could find the Agency's legitimate reason for this downgrade to be pretext for retaliation against Parker for engaging in protected activity.  *See supra* § II.A.2; *Waggel v. George Washington Univ.*, 957 F.3d 1364, 1376 (D.C. Cir. 2020) ("While timing can establish a *prima facie* case of retaliation, dislodging an employer's nonretaliatory explanation as pretextual at the third step of *McDonnell Douglas* requires positive evidence beyond mere proximity." (internal quotation marks and citation omitted)).

Parker's second theory of retaliation is based on Sellers's "pervasive and severe adverse treatment" in the trial "war room."  ECF No. 39 at 24.  Assuming Sellers's conduct constitutes a cognizable adverse employment action, Parker has failed to establish causation.  Parker argues that the time between when Jankowski warned Sellers about his conduct (October 20, 2017) and when Sellers made "numerous threatening statements" toward Parker (starting October 30, 2017) reflects a temporal nexus supporting an inference of retaliation.  *Id.* at 24–25.  Parker fails, however, to confront the fact that, according to his own allegations, Sellers had begun his allegedly discriminatory conduct toward Parker as early as August 2017.  *See, e.g.*, ECF Nos. 1 ¶¶ 9–11; 37-3 at 12–13.  Moreover, Parker neither explains nor points to any evidence showing that Sellers's conduct demonstrated a "sudden or marked change" after Sellers allegedly learned of Parker

19

engaging in protected activity. *Walker*, 798 F.3d at 1093 (rejecting argument that there was an inference of retaliation based on temporal proximity when employer's behavior did not change after learning of EEO activity). Instead, according to Parker, Sellers used "threats, insults, made derogatory comments, and verbal [sic] intimidated [him] on a routine basis" starting on October 10, a week *before* Parker's protected activity. ECF No. 39-3 at 13. On these facts, even when viewed in the light most favorable to Parker, no reasonable jury could find that Parker's reporting caused Sellers to retaliate against him. Accordingly, Parker has failed to raise a genuine issue of material fact even on his prima facie case of retaliation.

## CONCLUSION

For the foregoing reasons, the Agency's Motion for Summary Judgment is **GRANTED**, and its Motion for Judgment on the Pleadings is **DENIED AS MOOT.**

**SO ORDERED.**

Date:   March 28, 2025

```
_____
       MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE
```